**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AcuSport Corporation, | ) | Case No. 18-52736 |
| | ) | |
| Debtor. | ) | Honorable John E. Hoffman, Jr. |

<u>**DECLARATION OF JOHN K. FLANAGAN IN SUPPORT OF FIRST DAY MOTIONS**</u>

John K. Flanagan declares, under penalty of perjury, in accordance with 28 U.S.C. § 1746:

1.      I am the Chief Financial Officer ("*CFO*"), Treasurer, and Secretary of AcuSport Corporation ("*AcuSport*" or "*Debtor*"), a corporation incorporated under the laws of the state of Ohio and Debtor in this chapter 11 case (the "*Case*").  I have been employed by AcuSport since September 10, 2012, and, since then, I have served in my current positions as CFO, Treasurer, and Secretary.  As a result of my tenure and positions with AcuSport, review of relevant documents, and discussions with other members of AcuSport's management team, I am familiar with AcuSport's day-to-day operations, business affairs, and books and records.

2.      I am authorized to submit this Declaration on behalf of Debtor.

3.      Unless otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, review of relevant documents, discussions with other members of AcuSport's management team, discussions with Debtor's advisors and other professionals, or are my opinion, which is based on personal experience and knowledge of Debtor's operations and financial affairs.  If I am called as a witness in this Case, I would testify competently to the facts set forth in this Declaration.

4.      I submit this Declaration to assist the Court and parties in interest with understanding the background of Debtor and the circumstances that resulted in the

commencement of this Case.  Further, I submit this Declaration to support Debtor's request for relief with respect to its (a) voluntary petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") and (b) first day motions and applications (collectively, the "**First Day Motions**") filed contemporaneously therewith. This Declaration is referred to as the "Flanagan Declaration" and is incorporated into each of the First Day Motions.

5.      To familiarize the Court with Debtor and the various types of relief it seeks at the outset of this Case, this Declaration is organized into four parts.  First, I provide general information regarding AcuSport and its business operations.  Second, I provide an overview of Debtor's organizational, capital, and debt structures.  Third, I describe the circumstances that led to the commencement of this Case, as well as Debtor's prepetition efforts to obtain financing and to market and sell its assets.  Fourth, and finally, I provide relevant facts that support each of the First Day Motions, which I believe are critical to ensure the least possible disruption to Debtor's ongoing business operations and chances for success in this Case.

### DEBTOR'S BUSINESS OPERATIONS

6.      AcuSport is recognized nationwide as one of the leading distributors of outdoor and shooting sports products. Employing more than 200 people, AcuSport is centrally headquartered in Bellefontaine, Ohio and has regional sales offices in Pennsylvania, Georgia, Minnesota, Montana, California and Texas. To ensure and enable customer service to the West Coast, AcuSport also operates a warehouse and distribution facility located in Salt Lake City, Utah.

7.      AcuSport provides consulting services to independent retailers, helping them to efficiently acquire products, utilize state-of-the-art business tools and provide value-added

services that increase profitability and strengthen retailers' businesses.  AcuSport's commitment
to independent retailers, along with great service, is the cornerstone of AcuSport's business.

8.      AcuSport is also dedicated to the shooting sports industry. AcuSport has
supported the industry through involvement in industry organizations.  Indeed, AcuSport has
received several awards, including the Shooting Industry Academy of Excellence Wholesale
Distributor of the Year award. Besides the Distributor of the Year award, AcuSport is
consistently recognized by major manufacturers as a "top distributor" for sales volume.

9.      AcuSport's role does not stop when customers' orders are taken and products are
shipped.  Subsequent to delivery to customers, AcuSport provides ongoing value-added tools and
services to make customers' businesses more profitable and efficient.

## DEBTOR'S ORGANIZATIONAL, CAPITAL, AND DEBT STRUCTURE

10.      Since its inception in 1982, AcuSport has been privately owned by no more than
three shareholders.  Currently, AcuSport's shareholders include: (i) William L. Fraim, Chairman
and Chief Executive Officer; (ii) James A. Broering, President and Chief Operating Officer; and
(iii) Key National Trust Company of Delaware, as Trustee of the 2012 Fraim Family Trust.  Only
Mr. Fraim and Mr. Broering have voting power, with Mr. Fraim holding the majority vote.

11.      In June 2015, AcuSport entered into a Credit Agreement (as amended, restated,
supplemented, or otherwise modified from time to time, the "***Prepetition Credit Agreement***") by
and among Wells Fargo Bank, N.A., a national banking association, as administrative agent for
and member of the prepetition secured lender group ("***Prepetition Lenders***").[1]  Pursuant to the
terms of the Prepetition Credit Agreement, Prepetition Lenders provided a secured term loan,
revolving loan, and other financial accommodations to AcuSport.   The initial term loan amount

---

[1] Prepetition Lenders consist of Wells Fargo Bank, National Association, Regions Bank, Citizens Bank, and Huntington National Bank.

was $6,345,000.00, and the initial revolving loan commitment was in the amount of $110,000,000.00, pursuant to the terms of the Prepetition Credit Agreement.

12.     As of the Petition Date and the filing of this Declaration, the balance owing the Prepetition Lenders under the Prepetition Credit Agreement is approximately $17.5 million.  As set forth in more detail below, AcuSport proposes to continue using the Prepetition Lenders' cash collateral to fund this Case, and to the extent necessary, to obtain additional postpetition financing from the Prepetition Lenders.

## EVENTS PRIOR TO THE COMMENCEMENT OF THIS CASE

A.      Since the 2016 Presidential Election, AcuSport and Other Firearms Businesses Have Experienced a Significant Reduction in Sales, Resulting in Financial Distress.

13.     At a time when the defense market experienced a downturn in demand, the civilian small arms and ammunition market of the firearms industry was doing well. Consumers were concerned about the possibility of stricter gun control laws, which led to increased sales. Many firearms manufacturers, retailers, and distributors, including AcuSport, understood that consumers anticipated Hillary Clinton would win the presidential election in 2016.  The common belief shared by businesses in the firearms industry was that demand would increase if Clinton was elected as President because consumers expected the new administration to seek to implement gun-control legislation.  As a result, AcuSport, along with other firearms businesses, prepared for a spike in demand by, among other things, purchasing substantial amounts of inventory.

14.     Clinton did not win the election, and in turn, there was no spike in demand for firearms.  Indeed, demand decreased.  According to an article recently published by Bloomberg,

firearm sales were worse in January 2018 than they have been since 2012.[2] The reduction in sales directly impacted AcuSport's gross revenue, and, ultimately, its bottom line. The harm to AcuSport's financial position was further exacerbated because AcuSport had expected — and prepared for — an increase in sales.

B.    AcuSport's Default under the Prepetition Credit Agreement and Subsequent Negotiations with the Prepetition Lenders

15.    The reduction in sales negatively impacted AcuSport's operational performance. AcuSport experienced an approximately 30% decrease in revenue in fiscal year 2017 compared to fiscal year 2016. The reduction to AcuSport's sales and bottom line came when it had extended its resources in preparation for what it (and the rest of the industry) projected to be an unusually profitable period. This scenario produced financial circumstances that left AcuSport unable to comply with certain financial covenants as required by the Prepetition Credit Agreement. Specifically, AcuSport failed to have sufficient "Fixed Charge Coverage Ratios" for the twelve-month period ending April 30, 2017 (and for each measurement period thereafter). Subsequent to April 30, 2017, AcuSport defaulted on certain additional obligations under the Prepetition Credit Agreement, and, ultimately, entered into a number of forbearance agreements with the Prepetition Lenders.

16.    On August 11, 2017, AcuSport and Prepetition Lenders entered into a formal forbearance agreement (as amended, the "***Forbearance Agreement***"), pursuant to which Prepetition Lenders agreed to provide additional funding and forbear from exercising rights and remedies relating to events of default that occurred and were ongoing under the Prepetition Credit Agreement. Thereafter, the Forbearance Agreement was amended multiple times, with

---

[2] Eliza Ronalds-Hannon and Polly Mosendz, *Remington's Bankruptcy Could Be The Tip Of The Iceberg*, BLOOMBERG, Feb. 16, 2018, http://www.msn.com/en-us/money/companies/remingtons-bankruptcy-could-be-the-tip-of-the-iceberg/ar-BBJcMXQ?ocid=se.

Amendment No. 13 to Credit Agreement and Amendment No. 6 to Forbearance Agreement having been executed as of April 16, 2018.

17.    AcuSport also retained Huron Consulting Services LLC as its financial advisor and Huron Transaction Advisory LLC as its investment banker, and agreed to seek a refinancing of its secured debt obligations held by Prepetition Lenders.  Huron Transaction Advisory LLC was retained for the purposes of preparing, marketing, and leading the consummation of one or more potential strategic alternatives, including without limitation, a refinancing process (and eventually a sale process).  With respect thereto, the Forbearance Agreement established particular milestones for AcuSport to satisfy.

18.    Through Huron Transaction Advisory LLC, AcuSport launched its refinancing efforts on or about September 5, 2017 and proceeded to contact at least 84 traditional and non-traditional lending institutions.  Of those contacted, 28 executed a Nondisclosure Agreement and received a Confidential Information Memorandum and access to a virtual data site.  Several of these lending institutions submitted an indication of interest which led to a management presentation and access to additional information about AcuSport.  Subsequently, only one of the lending institutions submitted a letter of intent, which was executed, but the terms stated therein could not be satisfied.

19.    Following AcuSport's inability to obtain take-out financing, it engaged in a process to sell its business, which was a condition to the continued forbearance of Prepetition Lenders under the Forbearance Agreement.

C.    <u>AcuSport's Extensive Prepetition Sale Process</u>.

20.    On or about January 16, 2018, AcuSport (with the assistance of Huron Transaction Advisory LLC) began a more fulsome sale process, and in connection with its

marketing efforts, contacted at least 148 financial and strategic investors.  Of those contacted, 48

potential investors executed a Nondisclosure Agreement and received a Confidential Information

Memorandum and access to the virtual data site.  Over the course of four months, AcuSport

received several verbal and written indications of interest from both financial and strategic

investors.  The investors that submitted the indications of interest received a management

presentation and access to additional diligence information.  Subsequently, the investors were

asked to submit a formal letter of intent which would outline their proposed structure and

purchase price.

21.     This extensive sale and marketing process produced offers from certain parties to

purchase specific assets of Debtor.  These offers included an offer submitted by Ellett Brothers,

LLC ("***Proposed Purchaser***") to purchase certain of Debtor's assets, free and clear of all liens,

claims, and encumbrances for the amount of $7,750,000 plus certain additional amounts to be

determined at or before closing.

22.     On April 11, 2018, AcuSport executed a non-exclusive letter of intent proposal

with an affiliate of Proposed Purchaser.  Thereafter, the parties negotiated a definitive asset

purchase agreement concerning a transaction.  On April 30, 2018, AcuSport and Proposed

Purchaser executed the asset purchase agreement (the "***Stalking Horse APA***"), which

contemplates that, among other things, Proposed Purchaser will acquire AcuSport's inventory,

real estate, equipment, technology, and certain other intangible assets existing as of the closing

(the "***Proposed Sale Assets***") for a purchase price of $7.75 million plus the value of AcuSport's

inventory as reported on a borrowing base certificate prepared in accordance with its Prepetition

Credit Agreement as of the closing.  Proposed Purchaser also has agreed, at AcuSport's option,

to collect any accounts receivable existing as of the closing subject to an administrative fee of

2.0% of the amount of any such collections.    The Stalking Horse APA requires that

consummation of a transaction take place in a chapter 11 case pursuant to an order entered by the

Bankruptcy Court administering such case.[3]

## DEBTOR'S FIRST DAY MOTIONS

23.    Through its First Day Motions filed in this Case, Debtor requests various types of

relief in order to permit Debtor to continue to effectively operate its business and, ultimately,

maximize the value of its estate.  Debtor's First Day Motions include the following:

(a)    Motion For An Order (I) Scheduling Expedited Hearings On Certain First Day Motions And Applications And (II) Approving The Form And Manner Of Notice Thereof ("***Expedited Hearing Motion***");

(b)    Motion For An Order Extending Debtor's Time To File Schedules Of Assets And Liabilities And Statement Of Financial Affairs ("***Schedules Motion***");

(c)    Motion For Authority To Continue Use of Existing Bank Accounts, Business Forms, Cash Management System, And For Waiver Of Investment Guidelines ("***Cash Management Motion***");

(d)    Motion For An Order (I) Authorizing Debtor To (A) Pay Prepetition Employee Wages, Salaries, And Other Compensation, (B) Reimburse Prepetition Employee Business Expenses, (C) Pay Prepetition Payroll Taxes And Benefits For Which Payroll Deductions Were Made, (D) Make Prepetition Contributions And Pay Prepetition Benefits Under Employee Benefit Programs, And (E) Pay Related Costs And Expenses; And (II) Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Relief ("***Employee Motion***");

(e)    Motion For An Order Authorizing Debtor To Pay Certain Prepetition Taxes And Fees ("***Taxes Motion***");

---

[3] On April 30, 2018, AcuSport closed on the sale of certain assets to J.W. Shultz, LLC pursuant to that certain Asset Purchase Agreement dated April 27, 2018.  Pursuant to that agreement, AcuSport sold certain businesses and related assets currently conducted by AcuSport's Retail Technology Group relating to the provision of point of sale software and services for certain of AcuSport's retail customers, as well as maintenance and support for AcuSport's point of sale software.  The business assets sold to J.W. Shultz, LLC did not include any other line of business conducted by AcuSport, including any of the assets to be sold to Proposed Purchaser, and did not result in the payment of any funds by J.W. Shultz, LLC to AcuSport.  In consideration of the acquisition, J.W. Shultz, LLC did agree to hire approximately 17 employees of AcuSport and to assume certain liabilities and obligations of AcuSport.

(f)     Motion For An Order Authorizing Debtor (I) To Perform Obligations Necessary To Maintain Insurance Coverage And (II) To Enter Into New Insurance Coverage As Needed ("***Insurance Motion***");

(g)     Motion For An Order (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services To Debtor And (II) Establishing Procedures For Determining Requests For Additional Adequate Assurance ("***Utilities Motion***");

(h)     Debtor's Application For An Order Authorizing Debtor To Employ And Retain Donlin, Recano & Company, Inc. As Notice, Claims And Solicitation Agent, Effective *Nunc Pro Tunc* To The Petition Date ("***DRC Application***"); and

(i)     Motion For Interim And Final Orders (I) Authorizing Debtor To Use Cash Collateral; (II) Authorizing Debtor To Enter Into A Standby Postpetition Financing Facility; (III) Granting Adequate Protection To Prepetition Secured Creditors; (IV) Modifying The Automatic Stay; And (V) Scheduling And Approving The Form And Method Of Notice Of Final Hearing ("***Cash Collateral Motion***").

24.     Having reviewed the First Day Motions, I believe the information they contain is accurate and correct and the relief they seek is necessary to avoid disruption and irreparable harm to Debtor and its estate.  Additional information regarding each of the First Day Motions is set forth below.

A.     <u>Motion For An Order (I) Scheduling Expedited Hearings On Certain First Day Motions And Applications And (II) Approving The Form And Manner Of Notice Thereof</u>

25.     The relief requested in the First Day Motions is essential to Debtor's operations and, in turn, its ability to successfully utilize the chapter 11 process.  Any delay with respect to the relief requested in the First Day Motions would severely hinder Debtor's ability to preserve and maximize the value of its estate for the benefit of its creditors.  For example, Debtor cannot continue operating its business without the relief requested in the Cash Collateral Motion, as it will not have the authority to make necessary payments in the ordinary course of its business. Similarly, the Employee Motion addresses issues critical to ensuring a stable relationship with

Debtor's employees as Debtor enters bankruptcy, without which Debtor may not be able to operate effectively.   The Cash Management Motion requests relief necessary for Debtor to continue making authorized payments and operating its business without disruption.   The Insurance Motion and the Taxes Motion likewise request relief necessary to maintaining Debtor's operations on a postpetition basis without taking unnecessary risks or jeopardizing the stability of the Case.   In addition, the Schedules Motion and the DRC Application request relief regarding administrative requirements that must be resolved quickly in order for Debtor's Case to run smoothly, without which the Case may suffer logistical or administrative issues.   Thus, all of the First Day Motions necessitate expedited, emergency hearings.

        B.      <u>Motion For An Order Extending Debtor's Time To File Schedules Of Assets And Liabilities And Statement Of Financial Affairs</u>

      26.      Debtor estimates that its matrix includes approximately 6,500 parties that may be interested in this Case.   Debtor has begun gathering the information needed in order to prepare and file its Schedules of Assets and Liabilities (the "***Schedules***") and Statement of Financial Affairs (the "***SOFA***").    However, given the circumstances, Debtor has a relatively small administrative staff, and properly completing its Schedules and SOFA will require the accumulation, review, and analysis of a significant amount of information and documents.   Prior to filing its chapter 11 petition in this Case, Debtor focused much of its efforts on financial restructuring and marketing for the sale of its business.   As a result, the fourteen-day time period provided by Bankruptcy Rule 1007(c) does not give Debtor sufficient time to complete its Schedules and SOFA properly.   Further, Debtor (and its employees) must devote their time and attention to business operations during the initial critical weeks of this Case. Debtor anticipates the Schedules and SOFA will be completed no later than June 14, 2018, and thus, is requesting an extension of thirty-one (31) days to file its Schedules and SOFA (for a total of forty-five (45)

days from the Petition Date).  Nevertheless, Debtor will make a good-faith effort to complete the Schedules and SOFA as soon as reasonably practicable within the additional time requested herein.

      C.      <u>Motion For Authority To Continue Use of Existing Bank Accounts, Business Forms, Cash Management System, And For Waiver Of Investment Guidelines</u>

27.      As set forth in the Cash Management Motion, Debtor seeks to maintain its six (6) existing bank accounts (the "***Bank Accounts***") at Wells Fargo Bank N.A. ("***Wells Fargo***") and at PNC Bank, NA ("***PNC Bank***") and to continue its existing cash management system (the "***Cash Management System***").  A diagram showing Debtor's Cash Management System and Bank Accounts is attached to the Cash Management Motion as <u>Exhibit A</u>.

28.      With respect to Wells Fargo, Debtor currently maintains five (5) separate accounts.  These accounts are internally labeled and described as follows:

- Master Operating Account, No. XXXXXX8529

- Depository Account, No. XXXXXX8511

- Payroll Account, No. XXXXXX8552

- ACH/Wire Account, No. XXXXXX8560

- Controlled Disbursement Account, No. XXXXXX1869

29.      With respect to PNC Bank, Debtor currently maintains one (1) account known as its Local Depository Account, No. XX-XXXX-5627.

30.      Each of these Bank Accounts is maintained for separate and distinct business purposes in support of Debtor's Cash Management System.  The depository account at Wells Fargo (the "***Depository Account***") serves as the collection point for funds moving through the Cash Management System.  No ACH originations or wire transfers are authorized from the Depository Account, and no checks or withdrawals are permitted therefrom.  The local

depository account at PNC Bank serves as a local depository account, from which funds are swept to the Wells Fargo Depository Account on a daily basis.

31.     The master operating account at Wells Fargo serves as Debtor's central operations account.  The funds in this account are transferred to the payroll account, the ACH/Wire account, or the controlled disbursement account at Wells Fargo to facilitate orderly payments for payroll, to vendors, and for other operations expenses.

32.     In addition, in connection with certain of the Bank Accounts and as a customary business practice, Debtor uses various checks and other business forms, including, without limitation, letterhead, purchase orders, and invoices (collectively, the "***Checks and Business Forms***").

33.     Debtor seeks to maintain the Bank Accounts to avoid delays in payments to administrative creditors, to ensure uninterrupted collection of payments from its customers, to ensure as smooth a transition into chapter 11 as soon as possible with minimal disruption, and to aid in Debtor's efforts to successfully complete its sale process and maximize value for creditors. The maintenance of the Bank Accounts provides stability, continuity, and convenience to Debtor, its customers, and its creditors at a time when mutual cooperation will assist in Debtor's ability to function effectively and preserve value in its Case.  Debtor also seeks the authority to, if necessary, open new accounts (while giving the U.S. Trustee notice of such newly opened accounts), wherever they are needed.

34.     Debtor does not intend to pay any debts incurred before the Petition Date without prior approval from the Court.  Debtor has the capability of determining what, if any, checks are unpaid and outstanding as of the Petition Date.  Debtor will direct each bank at which Debtor maintains the Bank Accounts not to pay any prepetition debts unless authorized by the Court.

35.     Destruction of all of Debtor's existing Checks and Business Forms would be a waste of the estate's resources.  Moreover, purchasing new correspondence, letterhead, checks, and other business forms would be expensive and burdensome to Debtor's estate and disruptive to Debtor's business operations, without conferring any benefit upon those dealing with Debtor or its estate.

36.     The ability of Debtor to maintain its current Cash Management System will help to ensure uninterrupted business operations.  Debtor's Cash Management System is ordinary, usual, and essential.  A significant amount of Debtor's revenue is directly deposited into Debtor's depository accounts.  The Cash Management System allows Debtor to control the flow of deposits into a centralized account and to distribute the funds to appropriate creditors when necessary.  Allowing Debtor to maintain its current Cash Management System will also allow Debtor to continue its business operations and focus on its chapter 11 Case and sale process, thereby benefiting the estate and creditors.

D.      Motion For An Order (I) Authorizing Debtor To (A) Pay Prepetition Employee Wages, Salaries, And Other Compensation, (B) Reimburse Prepetition Employee Business Expenses, (C) Pay Prepetition Payroll Taxes And Benefits For Which Payroll Deductions Were Made, (D) Make Prepetition Contributions And Pay Prepetition Benefits Under Employee Benefit Programs, And (E) Pay Related Costs And Expenses; And (II) Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Relief

37.     As set forth in the Employee Motion, as of the Petition Date, Debtor owed certain Prepetition Compensation, Prepetition Deductions, Employee Benefits, and Business Expenses (each as defined below) to its current employees and those that were terminated just prior to the commencement of the Case.  Any delay in paying such items would seriously harm the Debtor's relationship with its workforce and could irreparably impair employee morale at the very time the dedication, confidence, and cooperation of Debtor's employees is most critical.  Accordingly,

Debtor faces the imminent risk that its operations will be severely impaired if it is not immediately granted authority to make the payments described in the Employee Motion.

Prepetition Compensation and Deductions

38.     As of the Petition Date, Debtor had approximately 220 employees, 211 of which were full time employees ("*FT Employees*") and 9 of which were part time employees ("*PT Employees*," and collectively with FT Employees, "*Employees*").   None of the Employees were members of a union.   On the Petition Date, and immediately prior to commencing this Case, Debtor terminated approximately 32 Employees (the "*Former Employees*") as part of its ongoing cost-reduction efforts, leaving the Debtor with just under 200 Employees on a postpetition basis. [4]

39.     Debtor pays Employees directly, rather than through a third-party vendor.   On or prior to each regular pay date, Debtor deposits funds in its payroll or general disbursement accounts to cover gross payroll and related benefits and taxes.

40.     Depending on their respective roles, Employees are either hourly wage earners or salaried.   Of the Employees, approximately 141 are hourly, and 79 are salaried.   Employees are paid on a biweekly basis every other Friday for services performed through the period ending one week prior to the pay date.   In other words, following each payroll payment, Employees are owed for one week of earned but unpaid compensation.   Employees are paid through direct deposit.

---

[4] The relief requested in the Employee Motion applies to all Employees, including the Former Employees, as it was not feasible for Debtor to make final payments to the Former Employees for wages or other obligations owing prior to filing the Case.   Debtor believes that honoring its obligations to both current Employees and Former Employees is absolutely vital to Debtor's ability to maintain a stable workforce and to preserve value for all creditors during this Case, the failure of which will be extremely detrimental to Debtor's ability to continue functioning in chapter 11.   Thus, references herein to "Employees" include both remaining employees and Former Employees, unless otherwise noted.

41.     In addition, certain Employees are compensated through commissions based on sales in the previous month.  Commissions are paid once per month, in arrears.  Debtor's obligation for commissions varies; it historically has been in the approximate range of $100,000.00 per month, but in the time period leading up to the filing of this Case, commissions owed have been substantially lower.

42.     Debtor's current average biweekly gross payroll (including commissions and including taxes owed for Employee withholding taxes) is approximately $490,000.00, plus applicable employer-paid payroll taxes of approximately $35,000.00 related to such earnings. As noted, payroll obligations are higher for payroll periods when commissions are paid, and lower for periods when commissions are not included.

43.     Debtor last paid payroll to Employees on April 27, 2018 for work completed through April 22, 2018.

44.     Debtor estimates that as of the Petition Date, it owes Employees approximately $380,000.00 for earned but unpaid wages, salaries, commissions, and other compensation, including applicable payroll taxes and withholdings ("***Prepetition Compensation***").  Of this amount, approximately $10,000.00 is attributable to commissions earned in March 2018.  In addition, approximately $36,500.00 of the Prepetition Compensation relates to the Former Employees.  Debtor believes that no individual Employee is owed more than $12,850.00 in Prepetition Compensation.

45.     In connection with the Prepetition Compensation, prior to the Petition Date, Debtor made certain deductions ("***Prepetition Deductions***") from Employees' compensation in order to make payments to third parties on behalf of Employees for items such as taxes, loan repayments to third parties, garnishments, support payments, and employee benefits, including

retirement accounts and insurance.   These amounts essentially belong to Employees but are temporarily held on their behalf by Debtor.   In the ordinary course of business, Debtor's Prepetition Deductions totaled approximately $182,000.00 per payroll period, including deductions for retirement account contributions, which totaled approximately $38,000.00 per period.

46.     The Prepetition Deductions owing to Employees as of the Petition Date are included in the estimated amount of Prepetition Compensation set forth above, and thus do not represent additional amounts owing beyond the Prepetition Compensation.   To further clarify the nature and magnitude of the Prepetition Deductions, however, Debtor estimates that the total amount of Prepetition Deductions held and owing by Debtor on the Petition Date was approximately $91,000.00, of which approximately $19,000.00 relates to Employee contributions to retirement accounts and $8,500.00 relates to deductions for the Employees' portion of medical and other insurance premiums, with the rest relating to taxes and other various obligations.

47.     Payment to Employees of Prepetition Compensation and the remittance of Prepetition Deductions are critical to Debtor's ability to continue its business operations and to maintain satisfactory Employee morale.   Indeed, without an order of this Court authorizing Debtor to timely satisfy its obligations to Employees for Prepetition Compensation and Prepetition Deductions, Debtor's ongoing operations, and, ultimately, its ability to maximize the value of its assets will be in serious jeopardy.   Employees (and their families) rely on their compensation and benefits to pay daily living expenses and provide for their households.   To minimize the personal hardship that Employees would face if Debtor could not timely pay Prepetition Compensation and Prepetition Deductions, and to maintain morale and stability

during this challenging time, Debtor is seeking authority to pay and honor all Prepetition

Compensation and Prepetition Deductions that have accrued but remain unpaid.  Debtor does not

intend to pay any individual Employee more than $12,850.00 in Prepetition Compensation,

which is the statutory "priority cap" set forth in section 507(a)(4) of the Bankruptcy Code.

<u>Reimbursement of Prepetition Expenses</u>

48.    In the ordinary course of business, Debtor's Employees incurred a variety of

business expenses prior to the Petition Date ("***Prepetition Expenses***"), relating to such items as

automobile mileage, parking, meals, postage, packaging, and office supply, for which they have

not been reimbursed.  Debtor's existing policy and procedure is to reimburse Employees on a

weekly basis for such expenses, subject to the approval of Employees' expense reports.  On

average, Debtor reimburses Employees approximately $21,878.00 on a monthly basis for

business expenses.  As of the Petition Date, Debtor estimates that less than $5,000.00 in unpaid

Prepetition Expenses were outstanding.

49.    Failure to pay the Prepetition Expenses would hinder Debtor's ability to

successfully operate its business in this Case.  Without such relief, Employees will be concerned

about personal liability for business-related expenses, which will further diminish Employees'

attention to satisfactorily doing their jobs.

<u>Employee Benefit Programs</u>

50.    In the ordinary course of its business, Debtor provides Employees with various

employee benefits, including various types of medical and other insurance, health savings and

flexible spending accounts, educational assistance, paid time off, 401(k) savings plans, workers'

compensation coverage, and other similar programs and miscellaneous benefits (collectively, the

"***Employee Benefits***").  Debtor's monthly cash outlay for expenses related to its various

Employee Benefits plans is approximately $205,000.00 (exclusive of the Prepetition Deductions referenced above). Interruption of any Employee Benefits would harm Employee morale and undermine Debtor's efforts to preserve value of its estate.

(i)     Insurance Benefits

51.     Debtor provides eligible Employees with various insurance benefits, including medical, dental, vision, short-term and long-term disability coverage, and life and accidental death and dismemberment insurance. With respect to all insurance benefits, a portion of the monthly premium is paid by Employees via payroll deductions, with Debtor paying the rest of the costs.

52.     Debtor offers a comprehensive health insurance plan for its Employees through United Healthcare. Debtor's health insurance plan is self-insured, and Debtor utilizes additional stop-loss insurance coverage to address potential large claims under the plan. Debtor's stop-loss coverage is provided by Alto Holdings, LLC. Debtor also provides a supplemental health insurance plan for executives through ArmadaCare.

53.      Debtor's monthly fixed costs in connection with the United Healthcare medical plan (including applicable stop-loss insurance) total approximately $33,000.00. Debtor's monthly cost to provide the supplemental ArmadaCare health insurance plan is approximately $6,262.00.

54.     Debtor offers Employees dental insurance through Delta Dental of Ohio ("***Delta Dental***"). Debtor's dental insurance plan is also self-insured, and its monthly fixed payments to Delta Dental total approximately $840.00, in addition to any premiums paid by Employees through payroll deductions.

55.   Vision insurance is provided to Debtor's Employees through Vision Service Plan ("*VSP*").  The vision insurance plan is fully insured.  Debtor's monthly premium payments to VSP total approximately $2,000.00, which is in addition to any premiums paid by Employees through payroll deductions.

56.   Short-term and long-term disability insurance is provided to Employees through programs administered by Cigna Health Insurance ("*Cigna*").  The short-term disability program is self-insured, but the long-term disability program is not.  Debtor makes monthly premium payments in respect of such insurance totaling approximately $2,066.00.

57.   Life and accidental death and dismemberment insurance is also provided to Employees through Cigna.  Debtor makes monthly premium payments in respect of such insurance totaling approximately $1,755.00.

58.   With respect to the self-insured plans described above, Debtor historically has been obligated to pay an aggregate amount between $150,000.00 and $300,000.00 per month in respect of medical, dental, and other covered claims under such plans.

59.   As of the Petition Date, Debtor owes the following approximate amounts in respect of its insurance benefit programs:

- United HealthCare:  Approximately $110,000.00 currently owing for known trailing medical claims relating to prepetition periods under the self-insured health plan.

- ArmadaCare:  No monthly premiums or other obligations owing (not including Prepetition Deductions as discussed above).

- Delta Dental:  Approximately $12,000.00 for known obligations currently owing covering early 2018 (exclusive of Prepetition Deductions as discussed above).

- VSP:  No monthly premiums or other obligations owing (not including Prepetition Deductions as discussed above).

- Cigna:   No obligations for short-term and long-term disability and life and accidental death and dismemberment not otherwise captured in the payroll obligations described in connection with the Prepetition Compensation (not including Prepetition Deductions as discussed above).

60.    Debtor believes it will have sufficient funding to pay all amounts for insurance benefits when they become due under its anticipated financing arrangements.

(ii)    Health Savings and Flexible Spending Accounts

61.    Eligible Employees are permitted to enroll in a health savings account ("**HSA**") or flexible spending account ("**FSA**") for health and dependent care.  Employees who elect to participate in an HSA or FSA make contributions that are deducted from their gross pay at a pre-determined amount set by Employees.  In addition, Debtor historically has made contributions to certain of its Employees' HSAs at the beginning of each year.

62.    WageWorks is the administrator for Employees' FSAs, and Optum Bank, Inc. ("**Optum**") is the administrator for Employees' HSAs.  Debtor believes it is current on all obligations in respect of the FSAs and HSAs, other than for certain Prepetition Deductions as described above.  However, as of the Petition Date, Debtor may owe a nominal amount to WageWorks and Optum in connection with their ongoing administration of the FSAs and HSAs, respectively.

(iii)    Paid Time Off

63.    Eligible Employees accrue paid time off, which may be used for vacation, sick leave, and personal time off ("**PTO**").  In the ordinary course of Debtor's business, Debtor has paid Employees for unused but accrued PTO upon termination of employment as part of their compensation.  The amount of PTO that an Employee earns, and that is eligible for a payout upon separation, is based upon the number of days or months that the Employee worked during the year of separation, the number of hours accrued, and the number of paid vacation hours taken

during the year.  As of the Petition Date, Debtor estimates that Employees had accrued approximately 6,500 hours in PTO for prepetition work.  The rough dollar value of such PTO would be approximately $237,000.00 in total, if paid out all at once.  The amount owing to Former Employees for PTO at the time of their separation was approximately $15,000.00.

64.     Debtor is requesting authority to permit Employees to continue to use their PTO in the ordinary course of business, including prepetition PTO, during this Case.  Debtor further is requesting authority to continue to pay Employees for unused but accrued PTO upon termination or expiration of employment in the ordinary course of business, pursuant to company policy.  In addition, Debtor is requesting authority to pay the PTO amounts owing to Former Employees who were terminated just prior to the filing of this Case.  Failure to pay all such amounts would have serious negative consequences for Debtor's operations and would adversely affect the ability to retain the Employees during the Case.

(iv)     401(k) Plan

65.     Eligible Employees may elect to participate in a 401(k) retirement savings plan administered by Prudential Retirement (the "***401(k) Plan***").  Under the 401(k) Plan, Employees may contribute certain percentages of their gross earnings in order to gain tax benefits while saving for retirement.  With respect to those Employees who participate in the 401(k) Plan, Debtor historically has had the option to contribute a discretionary match amount each calendar quarter, limited to the first 6% of Employees' contributed pretax earnings,  but no such amounts were owing as of the Petition Date.  Aside from the Prepetition Deductions to be contributed to the 401(k) Plan for Employees (as discussed above), Debtor believes that it has no outstanding prepetition obligations under the 401(k) Plan.

(v)     Workers' Compensation

66.     In addition to the employee benefits discussed above, Debtor provides Employees with workers' compensation insurance through the State of Ohio, as required under state law. The workers' compensation program is a fully insured plan with annual premiums being assessed at the outset of each annual coverage period based on the total dollar amount of claims made in the prior annual coverage period.  Debtor's premium payments are paid in advance of each quarter throughout the annual coverage period.

67.     Debtor's current coverage period began in July 2017 and will end June 30, 2018, with a new period beginning on July 1, 2018.  Payments under the program are due to the State of Ohio every other month in the amount of approximately $28,000.00.  Debtor made its last payment of $28,000.00 for the current period on April 27, 2018, and thus, believes no prepetition amounts are owing in respect of such insurance.  Debtor anticipates that its next payment will not be due until July 1, 2018, and the amount due at such time may be somewhat less than has historically been owed.

<u>Costs and Expenses Incidental to Prepetition Employee Obligations</u>

68.     As of the Petition Date, Debtor estimates it may owe approximately $9,500.00 in additional administration and processing costs relating to prepetition obligations to or on behalf of Employees in connection with their Employee Benefits.

69.     Debtor does not believe any prepetition amounts are owing to Prudential Retirement, the 401(k) Plan's third party administrator, or to The Ultimate Software Group, Inc. ("***Ultimate Software***"), Debtor's provider of payroll processing software.  Nevertheless, Debtor is requesting authority to make payments for any unknown prepetition obligations in nominal amounts that may be owing to Prudential Retirement and Ultimate Software in order to avoid any disruptions in service related to Employee Benefits and obligations.

<u>Additional Support for Employee Motion</u>

70.     Failure to make payments for current wages and benefits to all Employees, including Former Employees, would have a serious detrimental effect on Debtor's workforce and the ability to continue operations on a postpetition basis.

71.     If Debtor does not pay Employees the amounts they are owed as of the Petition Date, Debtor will almost certainly suffer harm that will by far outweigh any savings to Debtor's estate.  The current Employees are critical – indeed necessary – to Debtor's efforts in this Case. Without such Employees, Debtor could not operate, which would result in immediate harm to the estate and its creditors and would jeopardize Debtor's ability to consummate the sale of its business.  Given the circumstances, Debtor believes it would be not only impractical but virtually impossible to find replacements for the current Employees should they terminate their employment.

72.     Moreover, if Debtor fails to pay the amounts it owes to the Former Employees as described above, the remaining workforce will almost certainly have an extremely negative reaction.  The remaining Employees will know the Debtor has not kept its promises to the Former Employees and will question whether they can be comfortable working for Debtor in that environment.    The estimated amounts owing to the Former Employees for Prepetition Compensation and PTO are approximately $51,500.00 -- a relatively small payment in the context of this Case.   Yet the consequences of failure to honor such obligations could be catastrophic.

73.     The importance of the relief sought in this Motion cannot be overstated.  Debtor relies on Employees to run its business and sell its products.  In turn, Employees rely on Debtor for compensation and benefits to support their livelihoods and families.  Without payment of the

amounts sought herein, Debtor will lose its Employees, who are trained and who possess institutional knowledge.  It is therefore a sound business decision to continue to pay these obligations in the ordinary course.  And, again, to the extent the payments requested herein relate to Former Employees, the benefits (and avoidance of negative consequences) from making such payments far outweighs the costs involved.

74.    To the extent payment of any medical or other insurance claims under self-insured Employee Benefit plans might exceed the statutory cap on priority claims of $12,850.00 for any individual Employee, such payments are likewise necessary and appropriate.  Employees are not commercial parties that can readily evaluate the credit risk attendant to their employment and benefits.  They rely on Debtor to assist in paying their medical and other insurance claims under the Employee Benefit plans in return for their work and the premiums they have paid under the plans.  If Debtor does not fulfill its obligations under the Employee Benefits plans, including the payment of medical and dental claims, Employee morale will be irreparably damaged, and Debtor risks quickly losing its workforce.  Under the circumstances, relief to pay such claims as they become due in accordance with Debtor's financing arrangements is crucial to the success of this Case.

75.    Debtor has sufficient funds to satisfy the amounts identified in the Employee Motion, by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and/or postpetition financing.  Also, under Debtor's cash management system, it can identify checks or transfer requests that relate to an authorized payment in connection with Employees' prepetition obligations and claims.

E.    Motion For An Order Authorizing Debtor To Pay Certain Prepetition Taxes And Fees

76.    In the ordinary course of its business, Debtor collects, withholds, and incurs taxes, assessments, and fees (collectively, the "**Taxes and Fees**") that it periodically remits to taxing, licensing, regulatory, and other governmental authorities ("**Taxing Authorities**").  The types of Taxes and Fees can be generally categorized as one of the following: sales and use taxes, property taxes, franchise and corporate-level taxes, and other business taxes.

77.    In connection with certain of the Taxes and Fees, Debtor collected funds prior to the Petition Date that it is holding in trust for Taxing Authorities, and that should be remitted to those Taxing Authorities.  In addition, other Taxes and Fees relating to prepetition periods may be assessed during the Case.

Sales and Use Taxes

78.    Debtor incurs and collects sales taxes that it must remit to various sales tax authorities on a periodic basis.  These taxes are incurred in connection with sales of its inventory to customers, and the sales tax rates are set by the relevant Taxing Authorities.  Debtor's filing and remittance deadlines vary by state.  Debtor periodically files sales tax returns in at least fourteen states.  In general, these are "trust-fund taxes" that are held by Debtor but essentially belong to the various Taxing Authorities.

79.    As of the Petition Date, Debtor estimates that it has collected and owes an aggregate amount of approximately $5,000.00 in sales taxes to various Taxing Authorities for sales completed prior to the Petition Date.

80.    In addition, Debtor is required to pay use taxes in Ohio on account of certain purchases of personal property and goods.  Debtor must self-assess the use taxes and make payments according to the requirements of applicable state law.  Debtor's use taxes are typically

25

estimated and paid in advance, then trued up the following month (depending on the actual taxes assessed), with Debtor receiving a credit or paying an additional amount the next month.  As of the Petition Date, Debtor estimates that it owes $2,000.00 in prepetition use taxes.

<u>Property Taxes</u>

81.     Debtor has obligations to certain Taxing Authorities for real and personal property taxes that come due periodically.  Debtor generally pays such property taxes in the ordinary course of business at differing times throughout the year, depending on the jurisdictions.

82.     Property taxes are generally calculated and assessed in arrears.  For 2017, Debtor owed Taxing Authorities approximately $95,000.00 for real and personal property taxes, of which nearly $90,000.00 related to real property taxes and approximately $5,000.00 related to personal property taxes.

83.     Debtor has previously paid $44,945.00 toward the real property taxes assessed for 2017.  Debtor estimates that as of the Petition Date, it owes a total of $43,605.00 in additional real property taxes for 2017.  Real property taxes for the first four months of 2018 have also accrued through the Petition Date, but such taxes will not be due until the end of 2018.

84.     Debtor typically pays a total of approximately $5,000.00 per year in personal property taxes in various jurisdictions where it operates.  The amounts making up this total are due and payable at various points throughout the year in the jurisdictions in which Debtor has personal property.  As of the Petition Date, Debtor estimates that it may owe a total of $5,000.00 for prepetition personal property tax obligations to all Taxing Authorities where such obligations are owed.

Franchise and Corporate Taxes

85.    Debtor is required to pay franchise and corporate-level taxes to certain Taxing Authorities in multiple states.  Debtor typically owes and pays approximately $30,000.00 per year to various Taxing Authorities for such taxes, but such taxes have not been paid in some time.  Thus, as of the Petition Date, Debtor owes an estimated $30,000.00 in franchise and corporate-level taxes to various Taxing Authorities.

Other Taxes

86.    Debtor is subject to various other types of taxes based on the volume of business Debtor conducts in the relevant jurisdictions, including the Ohio commercial activity tax (the "*CAT Tax*"), the Georgia net worth tax (the "*GNW Tax*"), and the Washington sales volume tax (the "*WSV Tax*").

87.    The CAT Tax is imposed on certain businesses for the privilege of doing business in Ohio.  It is measured by gross receipts relating to business transactions occurring in Ohio, and it is imposed on businesses with gross receipts exceeding $150,000.00 per calendar year.  The CAT Tax is paid quarterly, and Debtor's current approximate quarterly obligation is $8,878.00 (which is the amount Debtor paid for the first quarter of 2018).  As of the Petition Date, Debtor estimates that it may owe prepetition CAT Tax in the approximate amount of $3,000.00 for the period beginning April 1, 2018 through the Petition Date.

88.    The GNW Tax is based on Debtor's sales in Georgia.  The GNW Tax is typically paid annually, in the approximate aggregate amount of $18,860.00 (which is the amount paid for 2017).  Estimating the current amount that would be owing for 2018 is difficult, but Debtor believes it may owe an amount approximating $5,000.00 in GNW Tax relating to prepetition periods.

89.     The WSV Tax is based on Debtor's shipments into Washington, which results in Debtor owing up to approximately $40,000.00 per year. The WSV Tax is typically paid monthly. As of the Petition Date, Debtor estimates it may owe WSV Tax in the amount of $1,000.00 for prepetition periods.

90.     If Debtor fails to timely satisfy its obligations to Taxing Authorities, the failure to do so will result in additional but unnecessary administrative and financial burdens on Debtor. Among other things, Taxing Authorities could attempt to suspend Debtor's operations, file liens, impose audits, and pursue other remedies for unpaid Taxes and Fees. Accordingly, there is a sound business purpose for paying the prepetition Taxes and Fees now, and it is in the best interest of its estate and creditors for the relationships between Debtor and Taxing Authorities to remain undisturbed.

F.      Motion For An Order Authorizing Debtor (I) To Perform Obligations Necessary To Maintain Insurance Coverage And (II) To Enter Into New Insurance Coverage As Needed

91.     Debtor maintains various insurance policies (the "***Insurance Policies***") in accordance with laws governing the jurisdictions in which Debtor operates its business as well as its contractual obligations with third parties. The Insurance Policies include coverage for, among other things, trade receivables, property and casualty, general liability, directors' and officers' liability, and workers' compensation liability.

92.     The total annual premiums for the Insurance Policies subject to the Insurance Motion are approximately $703,290.17. Debtor's premiums are due at varying times throughout the year, and given the size of the overall obligation for insurance coverage, Debtor finances certain of the premiums through third parties.

93.     The coverage types, levels, and premiums for the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted

by Debtor, and Debtor believes that they are similar to insurance coverages typically carried by businesses of a comparable size and type to that of Debtor.  Debtor further believes it has no due but unpaid obligations under the Insurance Policies as of the Petition Date.

94.     Debtor obtains trade credit insurance through Coface North America Insurance Company ("*Coface*") pursuant to a Premium Payment Agreement (the "*Coface Agreement*") that Debtor entered into on or about January 30, 2018.  A copy of the Coface Agreement is attached to the Insurance Motion as Exhibit A.

95.     Pursuant to the Coface Agreement, Coface permits Debtor to pay its annual premium over time, rather than paying the full amount that would otherwise be due up front.  In effect, Coface finances Debtor's premium, which totals $275,000.00 for 2018.  Under the Coface Agreement, Debtor has agreed to pay Coface a total of $293,500.00 in exchange for the right to pay the premium over time, with an initial installment of $87,250.00 followed by three (3) quarterly installments of $68,750.00 each.  Debtor's next quarterly payment in the amount of $68,750.00 will be due and payable on June 30, 2018.

96.     Debtor finances its general corporate liability and related policies through IPFS Corporation ("*IPFS*") pursuant to a premium financing agreement (the "*IPFS PFA*") that was entered into on or about November 2, 2017.  The policies subject to the IPFS PFA provide property and casualty coverage and coverage for various types of general liability claims, including automobile liability, workers' compensation liability, crime, directors' and officers' liability, executive risk liability, errors and omissions, and travel accident.  A copy of the IPFS PFA is attached to the Insurance Motion as Exhibit B.

97.     Pursuant to the IPFS PFA, IPFS pays the up-front premiums on various policies to Debtor's insurance carriers.   The total annual amount of such premiums is approximately

$428,290.17.   In return, Debtor was required to make an initial downpayment of $42,829.02, followed by ten monthly installments totaling $396,481.40.   Under the IPFS PFA, Debtor is obligated to pay IPFS $39,648.14 per month to and through September 2018.   The interest rate under the IPFS PFA is 6.19%.   Debtor paid the May installment under the IPFS PFA on or about April 18, 2018, so the next monthly payment will be due June 1, 2018.

98.     The Insurance Policies maintained by Debtor will eventually expire under their terms, beginning with policies due to expire on October 31, 2018.   Maintenance of insurance coverage is required under the certain laws of the jurisdictions in which Debtor operates, contractual agreements, prudent business practices, and the requirements of the Office of the United States Trustee.

99.     To the extent that any Insurance Policy premiums may be attributed to prepetition insurance coverage, Debtor believes that payment of such Insurance Policy premiums is necessary and appropriate to ensure continued coverage.   Similarly, the continued payment of Insurance Policy premiums as and when such payments are due and payable is necessary to ensure continued coverage.   Furthermore, payment of amounts due under the Coface Agreement and the IPFS PFA is necessary and reasonable to continue uninterrupted insurance coverage for Debtor's business.   Unless Debtor is authorized to continue to pay its financed premiums, Coface and IPFS may have the right to cancel Debtor's Insurance Policies and leave Debtor without ongoing coverage.

100.     As a fiduciary for the bankruptcy estate, Debtor would be at risk of violating its fiduciary duties if it in any way jeopardizes coverage provided under the Insurance Policies.   The potential harm and economic disadvantage that would stem from the cancellation of the Insurance Policies and failure to renew the Insurance Policies or revise, extend, supplement,

change, or enter into new insurance arrangements as needed, are grossly disproportionate to the amount of the Insurance Obligations and the costs to renew, revise, extend, supplement, change, or enter into new insurance coverage.

  G. <u>Motion For An Order (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services To Debtor And (II) Establishing Procedures For Determining Requests For Additional Adequate Assurance</u>

101. In the normal conduct of its business operations, Debtor obtains typical utility services, such as electric, telephone, and other services which may be deemed to be utilities, such as telecommunications, network, and other similar services (the "***Utility Services***") from numerous utility providers ("***Utilities***").

102. Ensuring that Utility Services continue without interruption is essential to Debtor's ongoing operations and, therefore, to the success of Debtor's Case.  If Utilities refuse or discontinue service, even for a brief period, Debtor's operations would be negatively impacted, thereby severely prejudicing Debtor's ability to achieve a sale of its assets and to meet the goals of this Case. It is therefore critical that Utility Services continue uninterrupted.

103. At this time, Debtor's management believes that the only Utilities providing Utility Services to Debtor are those Utilities listed on Exhibit A attached to the Utilities Motion. The amounts shown on Exhibit A to the Utilities Motion equal one half of the estimated average monthly disbursement made to each Utility for Utility Service.  As shown on Exhibit A to the Utilities Motion, prior to the Petition Date, Debtor spent approximately $42,000 per month for Utility Services.  Debtor anticipates continued utilization of Utility Services commensurate with its prepetition usage thereof.

H.   Debtor's Application For An Order Authorizing Debtor To Employ And Retain Donlin, Recano & Company, Inc. As Notice, Claims And Solicitation Agent, Effective Nunc Pro Tunc To The Petition Date

104.   It is expected that more than 6,000 parties will require notice of Debtor's bankruptcy filing and these proceedings. In view of the number of anticipated claimants and the complexity of Debtor's business, the appointment of Donlin, Recano & Company, Inc. ("**DRC**") as notice, claims and solicitation agent is both necessary and in the best interests of both Debtor's estate and its creditors.

105.   Debtor believes, based on all engagement proposals obtained and reviewed, that DRC's rates, as set forth in the DRC Application, are competitive and reasonable given DRC's quality of services and expertise.

I.   Motion For Interim And Final Orders (I) Authorizing Debtor To Use Cash Collateral; (II) Authorizing Debtor To Enter Into A Standby Postpetition Financing Facility; (III) Granting Adequate Protection To Prepetition Secured Creditors; (IV) Modifying The Automatic Stay; And (V) Scheduling And Approving The Form And Method Of Notice Of Final Hearing

106.   Pursuant to the Cash Collateral Motion,[5] Debtor is seeking authority to use Cash Collateral, in accordance with the terms of the proposed Interim Order and final order to be entered after a final hearing.  Debtor also is seeking authority to enter into a standby postpetition financing facility (more fully described below) (the "**Standby Loan**" or "**Postpetition Revolving Loan**") from Wells Fargo Bank, N.A., a national banking association, as administrative agent ("**Postpetition Agent**") for each member of the Lender Group and the Bank Product Providers ("**Postpetition Lenders**"), pursuant to the terms of the Interim Order and a final order to be entered after a final hearing.  Debtor is further requesting authority to execute and enter into the Postpetition Agreement (as defined below) and other loan documents (collectively, the

---

[5] Capitalized terms used but not defined in this description of the Cash Collateral Motion have the meanings given them in the Cash Collateral Motion.

"**Postpetition Loan Documents**") and to perform such other and further acts as may be necessary

to obtain DIP Financing.   The use of cash collateral (as such term is defined in the Interim Order)

(the "**Cash Collateral**") together with access to a Standby Loan, should it be needed, will

provide working capital to Debtor for use in its operations in accordance with the budget (the

"**Budget**") that is attached to the Interim Order as Exhibit A.

107.    Debtor has worked with its existing lenders to propose a financing solution in this

Case that solves two issues: (i) although Debtor's budget suggests that it will have enough cash

collections during the Case to pay its expenses as they come due while avoiding a deterioration

of the lenders' collateral position, a delayed payment or other timing mismatch could cause

Debtor to have inadequate funds to pay its bills and could put at risk the sale process designed to

maximize value for all creditors; and (ii) the existing cash management system automatically

applies cash receipts to the Prepetition Obligations (as described in the Cash Collateral Motion)

and altering the cash management system would cause distracting operational disruptions.

108.    Under the proposed financing agreement, Debtor would be allowed to use cash

collateral without changing its cash management system.  As Debtor's customers make payments

into the existing cash management system, such cash receipts would be provisionally applied to

the Prepetition Obligations (similar to how receipts were applied prepetition, though final

application of postpetition payments is subject to the Challenge Period provisions found in

Paragraph 8 of the proposed Interim Order). However, so long as Debtor is protecting the

Prepetition Lenders' collateral position (which is measured by "Adjusted Availability" as

defined in the proposed Interim Order), Prepetition Agent will un-apply and remit cash receipts

to Debtor to pay expenses set forth in the Budget negotiated between Debtor and the Agent and

Lenders. The conditions for this remittance are (i) no Events of Default having occurred

postpetition and (ii) Debtor must have "Adjusted Availability" under the Prepetition Credit Agreement. This "Adjusted Availability" test helps ensure that Prepetition Lenders are adequately protected by confirming that the Prepetition Obligations' collateral coverage, as calculated by the prepetition Borrowing Base, has not deteriorated precipitously.  Currently, Debtor has approximately $2.2 million of cushion in the Borrowing Base calculation, and, under Debtor's forecasts, the smallest this cushion even gets is approximately $300,000. Together, these provisions enable Debtor to perform to its Budget (if collections are consistent with expectations) and avoid disrupting Debtor's established cash management process. This proposal also assuages concerns of the Prepetition Lenders regarding collateral erosion due to cash collateral use and preserves the ability of other parties to review the Prepetition Lenders' liens and claims before any payments are applied on a permanent basis.

109.   The proposed cash collateral use and financing achieves these goals while also costing less than a typical debtor-in-possession loan – this arrangement avoids the need for Debtor to obtain a financing to fund all of its expenses and instead provides for an emergency reserve of financing that only creates costs for Debtor if Debtor uses that emergency financing.

110.   Under the proposed Interim Order, when funds are applied to the Obligations, the Prepetition Lenders have agreed that the repaid Prepetition Obligations will no longer accrue interest, even if those funds are eventually un-applied and remitted to Debtor. The effect of the un-application of funds will be that the applicable Prepetition Obligations will be automatically reinstated, with the same validity, security, and priority as if no payment had even been applied to such Prepetition Obligations (though again, no interest will accrue on such "paid" Prepetition Obligations during the period when funds have been applied to such Prepetition Obligations, providing Debtor significant interest savings).

34

111.   The Standby Loan is discrete and designed to protect the value maximizing sale and orderly wind-down process of Debtor.  Specifically, the Agent and Lenders have proposed providing up to $1,000,000 of Postpetition Debt. The Standby Loan would only be drawn upon if Debtor has inadequate postpetition cash collateral to pay its bills (i.e., if a timing mismatch happens and cash receipts have not been received when expected). The Standby Loan is governed by the same terms and conditions as the Prepetition Revolving Loans, and it would bear the same interest as is currently accruing on the Prepetition Debt.  There is no commitment fee attached to the Standby Loan.  Instead, Debtor will only incur fees if it actually uses the Standby Loan, as follows:  a $50,000 fee for the first draw and a $100,000 fee upon the second draw. Debtor does not project needing to use the Standby Loan, but it believes it is necessary and appropriate to protect against unforeseen risks to the estate and the Case.

112.   Debtor believes this hybrid cash collateral and Standby Loan structure offers the best opportunity to maximize the value of the estate and distributions to creditors. Here, Debtor, through negotiation with its existing lenders, has avoided the cost of documenting a new postpetition loan, avoided having to pay added fees and interest involved with such a facility, and avoided an unnecessary distraction from the primary goal of this case: to maximize value of Debtor's assets under the circumstances. Debtor is not proposing to cross-collateralize prepetition debt, and the terms of this proposed financing structure should be evaluated as an alternative to the more aggressive postpetition financing proposals that are typical in similar cases.

113.   Debtor could not obtain postpetition financing by merely offering a prospective lender an administrative expense claim or a junior lien – particularly given Debtor's recent efforts to obtain financing from other lenders and the circumstances surrounding this Case.

Consequently, Debtor focused its efforts and negotiations with Prepetition Agent, who is also Postpetition Agent, in an attempt to reach the best possible terms for Debtor's postpetition financing.  Debtor, in the exercise of its business judgment and consistent with its fiduciary duties, has concluded that the terms and conditions of the Standby Loan, particularly given the Prepetition Lenders' willingness to consent to Debtor's use of Cash Collateral, are fair and reasonable under the circumstances.

114.    Debtor submits that the interest rate proposed under the Standby Loan is more than reasonable given the state of the market and Debtor's financial affairs.  Further, Debtor is confident that it would not be able to obtain unsecured credit allowed as an administrative expense, or credit secured solely by liens and security interests junior to any and all existing liens on Debtor's assets.  Rather, the circumstances of this Case require Debtor to obtain financing by granting Postpetition Lenders a lien that is junior to Prepetition Liens on the same assets, junior to preexisting liens that are senior in priority to the Prepetition Liens, and senior to any and all preexisting liens that are junior to the Prepetition Liens.

115.    The terms set forth in the Standby Loan were negotiated in good faith and at arm's length.

(Remainder of Page Intentionally Left Blank)

Executed this 1st day of May, 2018


*/s/ John K. Flanagan*
John K. Flanagan
AcuSport Corporation

Respectfully submitted,

*/s/ Thomas R. Allen*
Thomas R. Allen (0017513)
Richard K. Stovall (0029978)
J. Matthew Fisher (0067192)
Erin L. Gapinski (0084984)
**ALLEN KUEHNLE STOVALL & NEUMAN
LLP**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Tel: (614) 221-8500
Fax:  (614) 221-5988
allen@aksnlaw.com
stovall@aksnlaw.com
fisher@aksnlaw.com
gapinski@aksnlaw.com

*Proposed Local Counsel for Debtor and
Debtor in Possession, AcuSport Corporation*

**BRYAN CAVE LEIGHTON PAISNER LLP**

Jason J. DeJonker, *pro hac vice* pending
161 N. Clark Street, Suite 4300
Chicago, IL 60601
Tel: (312) 602-5000
Fax:  (312) 698-7405
jason.dejonker@bclplaw.com

and

Cullen Kuhn, *pro hac vice* pending
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102
Tel:  (314) 259-2000
Fax:  (314) 552-8869
ckkuhn@bclplaw.com

*Proposed Counsel for Debtor and
Debtor in Possession, AcuSport Corporation*